## AFFIDAVIT OF TASK FORCE OFFICER MATTHEW MORRISSEY IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Task Force Officer Matthew Morrissey, being duly sworn, hereby depose and state as follows:

### Introduction

1.      I make this affidavit in support of applications for the following search warrants pertaining to electronic devices that were owned, possessed, and/or controlled by Felipe JONET-BRANCO (DOB: xx/xx/1994) (hereinafter, "JONET-BRANCO"):

> i.      **26-mj-6235-MPK**: warrant to search the Apple iPhone with Banks & Brancos lock screen that is described in Attachment A-1 ("Target Phone 1");
>
> ii.      **26-mj-6252-MPK**: warrant to search the Apple iPhone with horse rider lock screen that is described in Attachment A-2 ("Target Phone 2");
>
> iii.      **26-mj-6253-MPK**: warrant to search the MacBook Pro laptop computer that is described in Attachment A-3 (the "Target Computer"); and
>
> iv.      **26-mj-6254-MPK**: warrant to search the Reolink surveillance hard drive that is described in Attachment A-4 (the "Target Hard Drive").

2.      On February 13, 2026, a federal criminal complaint issued charging JONET-BRANCO with (1) possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841, and (2) possession of one or more firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (the "Target Offenses"). There is probable cause to believe that information stored in the electronic devices listed above, described in Attachments A-1 through A-4 (collectively, the "Target Devices"), contains evidence, fruits, and/or instrumentalities of these crimes, as described in Attachments B-1 and B-2.

3.      The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, and other sources.

The word "agent" or "investigator" is used in this affidavit for all federal, state, and local law enforcement officers. The dates and times in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of obtaining the above search warrants, I have not set forth every fact learned during the investigation or recounted every investigative technique employed. Rather, I am only setting forth information necessary to support probable cause for the above search warrants.

### Agent Background

4.    I am a Massachusetts State Police Trooper. I have been so employed since March 2012. Prior to my State Police employment, I was employed as a Town of Milton Police Officer for approximately 6 years, serving as both a patrolman and a narcotics investigator. During my 13 years as a State Police Trooper, I have been assigned to both the Uniformed Branch and the Division of Investigative Services. I am currently assigned to the Commonwealth Interstate Narcotics Reduction Enforcement Team ("CINRET"), where my responsibilities include the investigation of narcotics offenses. Prior to this assignment, I was assigned to the Plymouth County District Attorney's Office Narcotics Unit. I have been involved in numerous narcotics arrests and investigations. I have attended the Massachusetts Top Gun Undercover Narcotics School. I have worked with and been trained by more experienced officers in the investigation of major narcotics organizations. On July 31, 2025, I was sworn in as a Task Force Officer with the Federal Bureau of Investigation ("FBI"). I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

5.    While performing my duties as a State Police Trooper, I have assisted in various

aspects of narcotics investigations, including undercover buys, controlled buys, court-ordered electronic monitoring, and surveillance. I have also written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds.

6.       Based upon my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, state, national, and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection of monies that constitute the proceeds of narcotics trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones to thwart law enforcement's use of electronic surveillance. I am also aware that narcotics traffickers speak in vague, guarded, or coded language when discussing their illegal activities, use text messages in lieu of phone calls to avoid speaking over the telephone, and employ a variety of counter-surveillance techniques to detect if their vehicles are being followed by law enforcement.

## Probable Cause to Believe That Federal Crimes Were Committed

7.       On January 29, 2026, I obtained a search warrant from the Brockton District Court to search Banks & Brancos, a clothing store located at 828 Crescent Street in Brockton, MA, that is owned and operated by JONET-BRANCO. The investigation revealed that Banks & Brancos was being used for the distribution and storage of controlled substances and was likely to contain

one or more firearms. The search warrant, application, return, and my affidavit in support of the application are attached as Exhibit A and incorporated herein by reference.

8.    On February 4, 2026, at approximately 6:30 p.m., investigators executed the search warrant at Banks & Brancos. In total, investigators seized 10 firearms, over 35 pounds of marijuana (with packaging), over 200 grams of psilocybin mushrooms,[1] and approximately $42,336 cash. Most of the controlled substances were seized from behind the front counter and in a rear storage room. The firearms were seized from a hidden drawer compartment under the front counter, inside a vending machine on the sales floor, and in plain view in the rear storage room next to a camouflage-colored handbag.[2]

9.    During the search warrant execution, investigators saw that there was a surveillance camera system in place at Banks & Brancos. A screen behind the front counter displayed live video of several areas of the store, including both sides of the front counter, the sales floor and vending machine, the rear storage room, and the exterior of the building.[3] Below is an image of the screen behind the front counter displaying the live surveillance video.

---

[1] Based on my training and experience, I recognized these substances as marijuana and psilocybin mushrooms. The substances will be further analyzed at the State Police Drug Laboratory.

[2] Investigators saw this handbag in JONET-BRANCO's car earlier the same day. Investigators also saw JONET-BRANCO carrying this handbag from his car to inside Banks & Brancos the previous day. When investigators searched the handbag, they found JONET-BRANCO's U.S. Passport Card, MA Driver's License, and other cards bearing his name, thousands of dollars in cash, and a key to the store's vending machine.

[3] There did not appear to be any video depicting the inside of the changing room.



10.     The surveillance camera system appeared to be connected to a Reolink hard drive located in the rear storage room (the Target Hard Drive). Additionally, investigators found a MacBook Pro laptop computer behind the store counter (the Target Computer). Investigators seized both the Target Hard Drive and the Target Computer.

11.     Investigators saw JONET-BRANCO coming and going from Banks & Brancos throughout the day on February 4, 2026. At approximately 6:30 p.m., they stopped JONET-BRANCO in his car after he left the store and drove toward the area of Howland Street. There were no other occupants in his car at that time. During his stop and detention, investigators seized from his person and car approximately $1,933 cash, two Apple iPhones (the Target Phones), and a set of keys that included a key to the front door of Banks & Brancos. My affidavit in support of the complaint against JONET-BRANCO is attached as Exhibit B and incorporated herein by reference.

**Investigators' Possession of the Target Devices**

12.    The Target Devices are currently in the possession of the Massachusetts State Police and are being stored at its facilities in Middleborough, MA. The Target Devices have not been searched and are in substantially the same condition as when they were seized. The Target Devices are stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the devices were seized.

### Probable Cause to Believe that the Target Phones and Target Computer Contain Evidence, Fruits, And Instrumentalities

13.    Based on my training and experience, and the facts set forth in this affidavit as well as Exhibits A and B, there is probable cause to believe that the Target Phones and Target Computer contain evidence, fruits, and instrumentalities of one or both Target Offenses.

14.    The Target Phones were seized from JONET-BRANCO's possession at the same time the search warrant at Banks & Brancos was executed. One of the Target Phones has a lock screen background displaying the Banks & Brancos logo. The investigation indicated that JONET-BRANCO had longstanding relationships and communicated with other members and associates of the Harvard Street Gang, such as Lue ANDRADE and Keanu FERNANDES, who were actively involved in drug trafficking and unlawful firearms possession. The investigation also showed that Banks & Brancos was an instrumentality of this drug trafficking organization, as a place where controlled substances were being distributed and stored.[4] The Target Computer was seized behind the store counter, which suggests that it will contain records and other information related to the business. Accordingly, the Target Phones and Target Computer are likely to contain evidence further linking JONET-BRANCO and Banks & Brancos to the Target Offenses.

---

[4] Notably, there were numerous depictions of drug-related imagery inside the Banks & Brancos store, as well as on clothing advertised for sale on its website.

15.     I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

16.     I know that many smartphones (which are included in Attachment B-1's definition of "hardware") can now function essentially as small computers. Modern Apple iPhones, such as JONET-BRANCO's phones, are smartphones. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

17.     I am aware that individuals who engage in drug trafficking frequently use mobile phones to facilitate their illegal activities, including by communicating with other members of the drug trafficking organization, their associates, and customers, as well as conducting surveillance and counter-surveillance in furtherance of their objectives and to protect the proceeds of their illegal activities. Individuals engaged in drug trafficking often utilize cell phones to arrange transactions, including taking orders specifying the type and quantity of a controlled substance and negotiating the price, time, date, and location of a drug transaction. Individuals involved in drug trafficking often take photographs and/or videos of their current drug supply to share with customers to entice them into drug transactions.

18.     Drug traffickers will often have multiple phones. In some instances, dealers will have a phone used specifically to conduct "street-level distribution," which is considered a customer phone. This is a phone which a dealer will use primarily to communicate with customers. The same dealer will use a different phone to communicate with his or her drug supply sources and other high-level members within his or her organization. This is done in an attempt to layer the dealer's operation and make it difficult for law enforcement to identify the various ways in which they communicate and conduct business. It is common practice for each of the multiple phones utilized by the dealer to be subscribed in other people's names or prepaid phones obtained with false information.

19.     Although drug dealers often use phones subscribed to other persons, change phones regularly, and/or use different phones for different purposes contemporaneously, I am aware that the phones themselves are often maintained by the user, even after they are deactivated. This is done for several reasons:

    a.      The phones are valuable; they may be turned off for a period of time and then reactivated at a later date with the same or a different phone number on it;

    b.      The phones contain valuable information, as stated below. Those involved in the business of illegal narcotics distribution are in the difficult position of attempting to limit law enforcement's ability to infiltrate them using their phones. Consequently, narcotics traffickers often use multiple phones, change phone numbers regularly, and limit access to certain phone numbers. At the same time, these persons need to maintain contact with their customers, co-conspirators, and suppliers. This dynamic forces these criminals to maintain contact information – usually within the phone itself – for their business, while remaining vigilant about law enforcement. Hence, these criminals maintain deactivated phones for the purposes of keeping current contact information for customers, co-conspirators, and suppliers;

    c.      There is a perception among those who distribute illegal narcotics that a deactivated phone is a safe phone – that is, that the phone is no longer a criminal instrument and there is no need to dispose of it; and,

      d.     There is a perception that, because those who distribute illegal narcotics are using phones in the names of other people or fictitious people, a deactivated or active phone is more difficult to trace to its user, making it safer, and therefore more likely to be maintained by the real user.

    20.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

      a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

      b.     Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

      d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

    21.    Based on my knowledge and training and the experience of other law enforcement officers and agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental

or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because:

    a.    The volume of evidence storage media such as hard disks, flash drives, CDs, and DVDs can store is the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b.    Technical requirements in analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

22.    Consequently, I am requesting authority for law enforcement agents to either copy the data at the place where it is located or transport the computer equipment for subsequent processing elsewhere.

**Probable Cause to Believe that the Target Hard Drive
Contains Evidence of the Target Offenses**

23.    Based on my training and experience, and the facts set forth in this affidavit as well as Exhibits A and B, there is probable cause to believe that the Target Hard Drive will contain evidence of one or both Target Offenses.

24.    I am aware that the company Reolink manufactures and sells equipment like the

Target Hard Drive for the purpose of creating and storing surveillance video. From my training and experience, I know that commercial surveillance systems typically preserve video recordings for approximately 30 to 60 days after they are recorded, or more, depending on the capacity of the storage device. From my training and experience, I also know that forensic examiners can extract stored surveillance video from equipment like the Target Hard Drive after it has been removed from its original location by investigators.

25.     Surveillance video that is stored on the Target Hard Drive will likely depict numerous activities that are relevant to the Target Offenses, including but not limited to:

> a.      JONET-BRANCO operating Banks & Brancos, and coming and going from the property;
>
> b.      The presence or absence of legitimate transactions that would account for the large amounts of cash seized from JONET-BRANCO and Banks & Brancos;
>
> c.      JONET-BRANCO possessing the camouflage-colored handbag that investigators found next to the firearm in the storage room;
>
> d.      JONET-BRANCO possessing and distributing controlled substances;
>
> e.      JONET-BRANCO possessing and handling firearms; and
>
> f.      Drug trafficking activity and firearms possession by individuals who were conspiring with JONET-BRANCO, such as Lue ANDRADE and Keanu FERNANDES.

26.     As stated above, the surveillance cameras were pointed at areas where such activities occurred, such as the storage room, store counter, and vending machine. It is also likely, based on this investigation, that these activities occurred throughout the months leading up to the search warrant execution for which there will be preserved video on the Target Hard Drive. All surveillance video contained on the Target Hard Drive should therefore be included in this search warrant, as described in Attachment B-2.

## CONCLUSION

27.    Based on the information described above, I have probable cause to believe that
JONET-BRANCO has committed federal crimes including possession with intent to distribute
controlled substances, in violation of 21 U.S.C. § 841, and possession of one or more firearms in
furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). I also have probable
cause to believe that evidence, fruits, and instrumentalities of one or both these crimes, as described
in Attachments B-1 and B-2, are contained within the Target Devices described in Attachments
A-1, A-2, A-3, and A-4.

I declare that the foregoing is true and correct under the penalties of perjury.


Sworn and attested to by telephone in accordance with Fed. R. Crim. P. 4.1, under the
pains and penalties of perjury,

/s/ Matthew Morrissey
_____
MATTHEW MORRISSEY
Task Force Officer


Electronically sworn to and subscribed telephonically in accordance with Federal Rule of
Criminal Procedure 4.1 on March ___, 2026.

HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Description of Equipment to Be Searched

The equipment to be searched consists of the following:

1.  One (1) Apple iPhone with Banks & Brancos lock screen ("Target Phone 1"), seized

    from Felipe JONET-BRANCO on February 4, 2026, which is depicted in the images

    below.



The equipment is located at the Massachusetts State Police, Middleborough Barracks – 326

West Grove Street, Middleborough, MA 02346.

**ATTACHMENT A-2**

**Description of Equipment to Be Searched**

The equipment to be searched consists of the following:

1. One (1) Apple iPhone with horse rider lock screen ("Target Phone 2"), seized from

   Felipe JONET-BRANCO on February 4, 2026, which is depicted in the images below.



The equipment is located at the Massachusetts State Police, Middleborough Barracks – 326

West Grove Street, Middleborough, MA 02346.

**ATTACHMENT A-3**

**Description of Equipment to Be Searched**

The equipment to be searched consists of the following:

1. One (1) MacBook Pro laptop computer (the "Target Computer"), seized from Banks & Brancos, 828 Crescent Street, Brockton, MA, on February 4, 2026.

The equipment is located at the Massachusetts State Police, Middleborough Barracks – 326 West Grove Street, Middleborough, MA 02346.

**ATTACHMENT A-4**

**Description of Equipment to Be Searched**

The equipment to be searched consists of the following:

1. One (1) Reolink surveillance hard drive (the "Target Hard Drive"), seized from Banks & Brancos, 828 Crescent Street, Brockton, MA, on February 4, 2026.

    The equipment is located at the Massachusetts State Police, Middleborough Barracks – 326 West Grove Street, Middleborough, MA 02346.

**ATTACHMENT B-1**

**Items to Be Seized**

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 21 U.S.C. § 841 (possession with intent to distribute controlled substances) or 18 U.S.C. § 924(c) (possession of one or more firearms in furtherance of a drug trafficking crime) (the "Target Offenses"), or conspiracy to commit these offenses, for the time period of January 1, 2025, to the present, including those related to:

      A.      The following people:

           1.      Felipe JONET-BRANCO (DOB: xx/xx/1994);
           2.      Lue ANDRADE (DOB: xx/xx/1995);
           3.      Keanu FERNANDES (DOB: xx/xx/1996);
           4.      Kelby CORREIA (DOB: xx/xx/1991);
           5.      Giovany FOUYOLLE (DOB: xx/xx/1997);
           6.      London COHEN (DOB: xx/xx/1989);
           7.      Adonis GRAHAM (DOB: xx/xx/1991);
           8.      Jose MENDES (DOB: xx/xx/1990);

      B.      The following topics:

           1.      Manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, pill/tablet presses, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, telephone bills, bank and financial records, and storage records, such as storage unit and storage locker receipts and safety deposit box rental records and keys;

           2.      The identity of persons occupying, possessing, residing in, owning, frequenting or controlling **Banks & Brancos, located at 828 Crescent Street, Brockton, MA**, or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephones, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax

17

returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents;

3.    Methods of communications between co-conspirators, rivals, or victims including the telephone numbers, messaging applications, and social media accounts used;

4.    Communications, photographs and video and audio recordings which document an association with other co-conspirators and/or which display controlled substances, and chemicals/materials, mechanisms, packaging and adulterants used in the manufacturing and distribution of controlled substances;

5.    Proceeds of drug trafficking, receipts and records of items purchased, transaction records, automobile transaction records, jewelry and fine metal transaction records, the manner and means by which items and necessities are paid for, transactions in cash and other monetary instruments, gambling records, sports betting records, betting slips, records reflecting transactions at casinos, jewelry, chains, bracelets, diamonds, credit cards, debit cards, money orders, and other instruments by which cash proceeds can be transacted and converted into good and services;

6.    Laundering of proceeds of controlled substances, through concealment of the true source of funds, and false statements concerning legitimate sources of income, including the presence (or absence) of paystubs substantiating income, receipts and records of items purchased, the manner and means by which items and necessities are paid for, transactions in cash and other monetary instruments, credit cards, debit cards, money orders, and other instruments by which cash proceeds can be transacted and converted into good and services.

7.    Locations and physical premises where evidence of the Target Offenses, and things of value are being stored and concealed, including storage units, safe deposit boxes, rental units, lockers, and properties, and the location and the physical whereabouts of where controlled substances, and items, materials, chemicals, equipment and paraphernalia associated with the manufacturing, ordering, packaging, importation, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, pill presses, manuals and other items and materials related to pill presses, packaging materials, storage

18

bins, containers, cutting agents, and scales, are stored, including geolocation information and data placing the user in proximity to these locations and premises;

    8.    Unlawful possession of firearms, ammunition, and firearms-related accessories, including but not limited to machinegun conversion devices;

C.    The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

D.    The following data that is relevant to the Target Offenses:

    1.    Names and contact information that have been programmed into the device(s) (including contacts lists);

    2.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    3.    Text messages both sent to and received from the device(s) (including any in draft form);

    4.    Incoming and outgoing voice mail messages both to and from the device(s);

    5.    GPS data;

    6.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form);

E.    Evidence of who used, owned, or controlled the equipment;

F.    Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

G.    Evidence of the attachment of other hardware or storage media;

H.    Evidence of counter-forensic programs and associated data that are designed to eliminate data;

I.    Evidence of the times the equipment was used;

J.      Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

K.      Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; and

L.      Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators.

II.    Serial numbers and any electronic identifiers that serve to identify the computer equipment.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI and/or Massachusetts State Police may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### Definitions

For the purpose of this warrant:

A.      "Equipment" means any hardware, software, storage media, and data.

B.      "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.      "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

20

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    A "record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.

Law enforcement personnel are authorized to retain a digital copy of all computer equipment seized pursuant to this warrant until the completion of its investigation or the completion of any trial, appeal, or collateral proceeding involving the records and data seized, after which time law enforcement personnel will dispose of the account duplicate consistent with the agency's evidence disposal policy.

## ATTACHMENT B-2

### Items to Be Seized

I.      All recorded surveillance video depicting the inside or outside of Banks & Brancos, 828 Crescent Street, Brockton, MA, for the time period of January 1, 2025, to the present.